**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISON**

| | | |
|---|---|---|
| RENEE LOVEJOY, | ) | CASE NO. 1:21-CV-00836-CEH |
| | ) | |
| Plaintiff, | ) | CARMEN E. HENDERSON |
| | ) | UNITED STATES MAGISTRATE JUDGE |
| v. | ) | |
| | ) | MEMORANDUM OF OPINION AND |
| COMMISSIONER OF SOCIAL SECURITY | ) | ORDER |
| ADMINISTRATION, | ) | |
| | ) | |
| Defendant, | ) | |

## I. Introduction

Plaintiff, Renee Lovejoy ("Lovejoy" or "Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security denying her applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). This matter is before me by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF No. 10). For the reasons set forth below, the Court REVERSES the Commissioner of Social Security's nondisability finding and REMANDS this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

## II. Procedural History

On April 21, 2015, Lovejoy filed applications for DIB and SSI, alleging a disability onset date of June 15, 2010. (ECF No. 9, PageID #: 160, 161). The applications were denied initially and upon reconsideration, and Lovejoy requested a hearing before an administrative law judge ("ALJ"). On March 29, 2017, an ALJ held a hearing, during which Lovejoy, represented by counsel, and an impartial vocational expert testified. (ECF No. 9, PageID #: 105-126). On June

1

20, 2017, the ALJ issued a written decision finding Lovejoy was not disabled.  (ECF No. 9, PageID #: 86-104).  The ALJ's decision became final on February 6, 2018, when the Appeals Council declined further review.  (ECF No. 9, PageID #: 55-60). Lovejoy then requested judicial review, which resulted in a Federal Court order of remand, on January 30, 2019, for proper legal standards to be used in the evaluation of Dr. Sunshine's opinion and the opinion from Lake County Department of Job and Family Services (LCDJFS). *Lovejoy v. Comm'r of Soc. Sec.*, No. 1:18-CV-514, 2019 WL 366687, at *11 (N.D. Ohio Jan. 30, 2019).

On August 7, 2019, the same ALJ held a new hearing, during which Lovejoy, represented by counsel, and an impartial vocational expert again testified.[1] (ECF No. 9, PageID #: 797-811). On September 9, 2019, the ALJ issued a written decision again finding that Lovejoy was not disabled.  (ECF No. 9, 765-796).  The ALJ's decision became final on March 17, 2021, when the Appeals Council declined further review.  (ECF No. 9, PageID #: 757-764). On April 22, 2021, Lovejoy filed her Complaint to challenge the Commissioner's final decision.  (ECF No. 1).  The parties have completed briefing in this case. (ECF Nos. 11 and 15). Claimant asserts the following issues for review:

> (1) Whether the ALJ has again erred in evaluating opinion evidence from Ms. Lovejoy's treating neurologist and Lake Count Job and Family Services.
>
> (2) Whether the ALJ's assessment of Lovejoy's residual functional capacity, absent restrictions on sustaining an ordinary routine, requiring extra breaks, and performing activities within a schedule, was harmless error.

(ECF No. 11 at 1).

---

[1] While Lovejoy's appeal was pending in the district court, Lovejoy filed a subsequent application for social security benefits. (ECF No. 9, PageID #: 859, 874). By order of the Appeals Council, the subsequent application was joined with the original claim for determination at the second hearing. (ECF No. 9, PageID #: 926).

2

## III. Background

### A. Relevant Symptom Testimony

The ALJ summarized Claimant's symptom testimony:

> The claimant alleges disability due to physical and mental impairment, namely epilepsy, tuberous sclerosis, anxiety, depression, posttraumatic stress disorder (PTSD), and panic disorder (Exhibit 2E, 3E, 6E, 10E, 14E, 25E). The claimant alleges difficulty with lifting, carrying, standing, and walking as a result of her conditions (Exhibit 3E). The claimant alleges she cannot drive, per doctor restrictions, and she has indicated some difficulty with activities of daily living, as she has to take breaks while doing household chores (Id.).
>
> The claimant testified at the March 29, 2017 hearing that she does not drive because she has not been allowed to since 2010 (Hearing Record, Exhibit 16A/11). The claimant said she never left the house alone and was never left alone at home for long periods (Id.). The claimant indicated her daughter helped her shower and do chores on days after she had seizures, because she felt sore, foggy, and nauseous (Id.). The claimant testified she was afraid to be alone with her grandchildren for more than an hour, because she did not want them to see her have a seizure (Id.). The claimant said she last worked for her own cleaning company in 2010, and she indicated the job ended because of worsening seizures (Id.). The claimant testified her seizures occur unexpectedly, usually when she was awake, and after she saw auras (Id.). The claimant indicated some seizures while sleeping, as she would wake up having urinated on herself (Id.). The claimant testified that during seizures, she could hear what was happening around her, but it was like a fog (Id.). She reported loss of bodily control during convulsive seizures, and had injured herself, falling into a dresser once and knocking out her teeth during on another occasion (Id.). The claimant also reported frequent focal seizures, wherein was in a fog and could hear things like a muffled drum, but could not respond (Id.). The claimant testified to feeling sore, foggy, and sick to her stomach after seizures (Id.). The claimant said her most recent seizure occurred the Thursday before hearing and lasted for just a few minutes (Id.). The claimant said she was last hospitalized for seizures in 2010, and she admitted that medications help (Id.). However, she reported side effects with Topamax, namely memory problems and bruising (Id.). The claimant also testified to depression and anxiety that began after her mother and sister were killed (Hearing Record, Exhibit

16A/12). The claimant testified to panic attacks that occur out of nowhere, and have caused her to have to leave the store while shopping (Id.). The claimant reported impaired memory, as she would forget things like shutting off the oven while cooking, and she indicated she cannot spell or help her son with his homework (Id.).

The claimant testified at the August 7, 2019 hearing that she is unable to work because of seizures and PTSD (Hearing Testimony). The claimant reported compliance with daily seizure medications (Id.). The claimant said she has fallen out of bed during a seizure, and has had to go to the ER (Id.). The claimant indicated she is still struggling from a mental health standpoint, as she experiences frequent panic attacks despite use of medications and counseling every couple of weeks (Id.). The claimant indicated she would be unable to work in part because her memory is bad (Id.). The claimant testified she feels sick to her stomach and her body is sore after a seizure (Id.). The claimant confirmed that there has been no time in which she was able to drive (Id.).

(ECF No. 9, PageID #: 775).

**B. Relevant Medical Evidence**

The ALJ also summarized Claimant's health records and symptoms:

On March 29, 2010, the claimant sought emergency treatment at Lake West Hospital for a syncopal/seizure episodes at home witnessed by the claimant's son, who reported a seizure followed by unconsciousness for about five minutes (Exhibit 1F/11-30). The claimant was noncompliant with treatment, as she had admittedly missed Topamax for the past couple of days (Id.). An EKG and head CT were unremarkable (Id.). Laboratory testing revealed low potassium, and was otherwise unremarkable (Id.). The claimant was treated with Topamax and monitored for several hours, without signs of repeat seizure activity (Id.). The claimant was discharged in stable condition with a prescription for Topamax and instructions to follow up with her primary care provider and neurologist (Id.).

On May 16, 2011, the claimant was brought to Lake West Hospital emergency room by emergency medical services (EMS) for a seizure with blood at the mouth, witnessed by the claimant's son (Exhibit 1F/50-130, 146-229). The claimant's father indicated a possible overdose, as she may have been doing crack cocaine and/or taking pills, and a bottle of Xanax was found in the house

4

(Id.). A head CT showed an old right parietal lobe infarct, and was otherwise unremarkable, and unchanged from previous (Exhibit 1F/111, 156). A tox screen was positive for cannabinoids, but negative for narcotics or benzodiazepines (Exhibit 1F/50-130, 146-229). The claimant went into respiratory acidosis, and was intubated in the ICU (Id.). She was extubated the next day (Id.). The claimant admitted depression, but denied suicide attempt or cocaine use (Id.). She admitted treatment noncompliance, as the claimant had been cutting back on Topamax because she was running out of the medication and could not get an appointment with her neurologist (Id.). The claimant indicated her last seizure was in March 2010 (Id.). The claimant presented as extremely anxious and determined to seek out Xanax or Ativan (Exhibit 1F/61). She refused Seroquel and was treated with Abilify (Id.). A psychiatric evaluation revealed no evidence of suicidal ideation, and neurologist Dr. Sunshine adjusted Topamax and started the claimant on Keppra (Exhibit 1F/50-130, 146-229). The claimant was discharged on May 18, 2011 in stable condition with final diagnoses of seizure disorder, acute respiratory failure, depression, severe metabolic acidosis, hypokalemia, and hypophosphatemia (Id.). She was prescribed Topamax and Keppra, and instructed to follow up with primary care and neurology (Id.).

Neurology visits in July 2011 and February 2012 contain complaints of left eye blurriness and stress; however, the claimant denied any seizure activity and reported tolerating Keppra well (Exhibit 2F/7-12; 4F/22-27, 79-84). Physical examinations were normal, revealing no neurological abnormalities (Id.). Joshua Sunshine, M.D., diagnosed the claimant with convulsions not elsewhere classified, noting seizures likely secondary to tuberous sclerosis (Id.). Dr. Sunshine continued the claimant on Topamax 100 mg and Keppra 500 mg daily, noting she was doing well on the medications, and ordered no driving (Id.).

On September 17, 2013, the claimant complained to Dr. Sunshine of a generalized seizure the week before with urinary incontinence, as well as occasional episodes with visual abnormalities with dark spots and urge to urinate (Exhibit 2F/13-15; 4F/19-21, 76-78). The claimant indicated issues with Topamax (Id.). Examination was normal (Id.). Dr. Sunshine assessed the claimant with seizures, tuberous sclerosis syndrome, and urinary urgency, increased Keppra from 500 mg twice a day to 100 mg twice a day, and ordered testing (Id.).

An ambulatory EEG conducted on October 4, 2013 was normal, with no evidence of epileptiform discharges, EEG seizures, or

lateralizing signs (Exhibit 4F/45, 113). Neurology treatment notes from November 2013 through March 2014 contain complaints of headaches and medication related weight gain and rash (Exhibit 2F/16-26; 4F/8-18, 65-75). However, the claimant indicated adequate seizure frequency; specifically, in December 2013, she indicated her last seizure occurred a month prior, and the one before that was two to three months earlier (Id.). Examinations were normal, revealing no neurological abnormalities (Id.). The claimant's neurologists diagnosed her with epilepsy, focal epilepsy, seizure, weight gain, and rash, and noted she was stable from an epilepsy standpoint (Id.). They adjusted the claimant's medications, continuing Topamax 100 mg twice a day and Keppra 100 mg, prescribing then discontinuing Lamictal 25 mg, then prescribing trileptal 150 mg (Id.). On January 20, 2015, the claimant complained to Dr. Sunshine of two seizures in the past month following significant stressors, as the claimant's daughter had a baby and son had open heart surgery (Exhibit 2F/2F/27-29; 4F/4-6, 61-63). However, the claimant did not go to the ER, and she was admittedly noncompliant with medications (Exhibit 2F/27). Examination was normal, and Dr. Sunshine attributed the breakthrough seizure to noncompliance and getting out of her routine (Exhibit 2F/2F/27-29; 4F/4-6, 61-63). Dr. Sunshine ordered follow up in August (Id.). The claimant did not return until October 16, 2015, at which time she complained of seizures with altered awareness occurring once a week (Exhibit 4F/1-3, 58-60). Examination was normal (Id.). Dr. Sunshine continued Topamax, increased trileptal to 30 mg BID, and ordered a headache diary and follow up in three months (Id.).

The claimant returned on December 1, 2015, complaining to Dr. Sunshine of 2 to 3 seizures per month (Exhibit 21F/4-6). The claimant reported slight altered responsiveness and waking from night all wet (Id.). However, she denied headaches, nausea, vomiting, or weakness, and indicated she was tolerating medications well (Id.). Examination was normal and Dr. Sunshine diagnosed the claimant with complex partial seizures (Id.). He continued the claimant on Topamax 100 mg in the morning and 200 mg in the evening, and trileptal 300 mg twice a day, and ordered follow up in three months (Id.).

Neurology treatment records from July 2016 through May 2018 contain complaints of unchanged symptoms, with some breakthrough seizures (Exhibit 14F/1), as well as panic attacks, memory loss, headaches, grief issues, and struggling with everyday life stressors (Exhibit 6F; 10F/1-32; 14F/1-28, 48-54). The claimant was occasionally tearful in the examination room;

however, examinations were otherwise normal (Id.). Dr. Sunshine adjusted the claimant's medications, as he decreased Topamax and prescribed Vimpat 50 mg twice a day (Id.). He completed requested paperwork and referred the claimant to behavioral health (Id.).

On July 2, 2018, the claimant complained to Dr. Sunshine of two to three episodes per month, with seizures triggered by stress (Exhibit 16F). The claimant also reported anxiety and PTSD related to the murders of her mother and sister; however, depression screening was negative (Id.). The claimant indicated current treatment at Signature Health for PTSD and panic attacks (Id.). Examination was unremarkable, as the claimant was alert and oriented, with a normal blood pressure level, no distress, normal heart, lungs, abdomen, and extremities, without edema, and normal pulses (Id.). Neurological examination was unremarkable, revealing no tremors, normal muscle bulk and tone, normal strength in all extremities, normal sensation and reflexes, normal coordination, with no ataxia, negative Romberg testing, and a gait within normal limits (Id.). Dr. Sunshine diagnosed the claimant with moderate episode of major depressive disorder and seizures, and continued the claimant's current medication regimen, namely Topamax 100 mg, one tablet in the morning and two in the evening, as well as Vimpat 50 mg twice a day (Id.). The record contains additional evidence of mental impairment.

On July 29, 2015, the claimant underwent consultative examination with Richard Halas, MA, complaining of depression stemming from the loss of her mother and sister, as well as inability to work due to seizures (Exhibit 3F). The claimant denied outpatient mental health treatment at the time (Id.). The claimant indicated she dropped out of school in the 9th grade when her parents divorced, and she reported being held back in the 6th grade (Id.). However, the claimant reported attending a community college RN program, with average grades (Id.). The claimant said she dropped out when her mother and sister were murdered (Id.). The claimant indicated that she currently resided with her father and stepmother, and she said her father brought her to the evaluation (Id.). The claimant denied any legal problems or drug use (Id.). The claimant reported poor health due to seizure activity, with two significant seizures occurring each week (Id.). The claimant presented as oriented, cooperative, neat and well kempt, with appropriate dress (Id.). However, she presented as more dependent than independent, with a flat, tentative, tearful presentation (Id.). The claimant sobbed when discussing the murders of her mother and sister (Id.). The claimant tended to

minimize psychological issues and seemed to focus on the extent of her physical problems (Id.). Mental status examination revealed slow, constricted speech, tearfulness, extremely poor eye contact, as the claimant looked down and away in a dejected, depressed manner, a depressed mood, flat affect, and overt anxiety, as the claimant's hands trembled noticeably when extended in front of her (Id.). The claimant appeared nervous, apprehensive, and fearful; however, she did not hyperventilate (Id.). Mental status examination revealed short, specific, goal-oriented responses, normal thoughts, and no confusion or lack of awareness (Id.). The claimant was able to do simple calculations, and she was slow, but accurate, in performing a serial seven task (Id.). The claimant was able to concentrate and recall five digits forward on digit span, and she understood two simple proverbs (Id.). Mental status examination revealed average, if not slightly above average estimated intelligence, and good insight and judgment (Id.). Dr. Halas diagnosed the claimant with major depression, recurrent type, and anxiety disorder, and assigned a global assessment of functioning (GAF) score of 45 (Id.).

From March 2017 through July 2019, the claimant underwent outpatient mental health treatment at Signature Health, consisting primarily of medication management with Hiu Kwan Yip, CNP, as well as some individual counseling (Exhibit 7F, 9F, 11F, 12F, 13F, 15F, 17F, 18F, 19F).

Treatment notes contain complaints of anxiety, daily panic attacks with shortness of breath, depression, crying spells, anhedonia, decreased hygiene, impaired concentration, racing thoughts, sleep problems, fatigue, restlessness, short term memory problems, fleeting suicidal ideation without intent, seizures, family stressors, and picking at her skin (Id.). The claimant indicated an extensive trauma history, including the murder of her sister, deemed a suicide by law enforcement, followed by the disappearance and murder of the claimant's mother a few years later, immediately following an argument with the claimant, as well as molestation/rape by an orthopedist who overmedicated the claimant, rendering her unable to consent (Id.). The claimant indicated she became the target of the investigation of her mother's murder, and the claimant indicated tremendous guilt related to the deaths of her mother and sister (Id.). The claimant was diagnosed with major depressive disorder, recurrent episode, severe, without mention of psychotic behavior, panic disorder without agoraphobia, generalized anxiety disorder, and posttraumatic stress disorder (PTSD), and assigned a GAF score of 55 (Id.). She was tried on various medications, including sertraline, Vistaril, Zoloft,

> Seroquel, Prazosin, Abilify, Celexa, buspirone, Cymbalta, trazodone, and Rexulti, with frequent adjustments (Id.). The claimant remained symptomatic, as examinations revealed overwhelmed behavior, a consistently sad, tearful, depressed, anxious, frustrated, and/or stressed mood, congruent affect, and occasionally poor memory (Id.). However, the claimant was oriented and cooperative, with adequate to good hygiene and grooming, fair to good eye contact, normal speech/language, thoughts, and associations, fair fund of knowledge, otherwise intact memory, and fair insight and judgment (Id.). The claimant was noncompliant with treatment at times, adjusting medications on her own and failing to start or increase medication dosages as instructed (Exhibit 11F/42, 48; 15F/12). The claimant admitted use of marijuana for anxiety and seizures, and she indicated some improvement at times with medication (Exhibit 11F/42, 66; 15F/12; 17F/25).

(ECF No. 9, PageID #: 776-779).

## C.  Opinion Evidence at Issue

### 1.  Dr. Joshua Sunshine

On January 17, 2014, Dr. Joshua Sunshine, Lovejoy's neurologist, completed an "Abilities Self-Sufficiency" form requested by the Lake County Department of Job & Family Services. (ECF No. 9, PageID #: 742-743). Dr. Sunshine indicated that Lovejoy suffers from epilepsy, which is expected to continue indefinitely. (ECF No. 9, PageID #: 742 (describing Lovejoy's prognosis expected to continue as "unforeseen" and "lifetime")). Dr. Sunshine indicated Lovejoy could not drive and that her mental limitations included the inability to sustain an ordinary routine, perform activities within a schedule, and interact with the general public. (ECF No. 9, PageID #: 742). Dr. Sunshine checked the "no" box for releasing Lovejoy for fulltime employment, part time employment, training, and basic hands-on stationary work only. (ECF No. 9, PageID #: 742). On January 20, 2015, Dr. Sunshine indicated that Lovejoy suffers from epilepsy and that her condition was expected to continue for twelve months or more and that she was "unemployable". (ECF No. 9, PageID #: 740-741). On January 10, 2017, on another

form completed at the request of Lake County Department of Job & Family Services, Dr. Sunshine checked the box indicating that he believed Lovejoy was "unable to engage in any substantial gainful activity" due to her impairment. (ECF No. 9, PageID #: 1468).

The ALJ gave Dr. Sunshine's opinions little weight. (ECF No. 9, PageID #: 784). (ECF No. 9, PageID #: 783-784).

### 2.  J. Bro C/O CCF

An undated "Abilities Self-Sufficiency" form, completed by "J. Bro C/O CCF" stated that Lovejoy was "100% disabled." (ECF No. 9, PageID #: 744). The form indicated that Lovejoy could carry out instructions and interact with the general public but could not perform activities within a schedule or sustain an ordinary routine.  (ECF No. 9, PageID #: 744). The form also indicated that Lovejoy was not released for full-time or part-time work, training, or basic hands-on stationary work. (ECF No. 9, PageID #: 745). Further, the form indicated that Lovejoy would see a neurosurgeon, orthopedic surgeon, and a chronic pain management doctor. (ECF No. 9, PageID #: 745).

The ALJ attributed this form to Dr. Sunshine and gave it little weight. (*See* ECF No. 9, PageID #: 783 ("The record contains opinions from treating neurologist Joshua Sunshine, M.D., rendered on fill in the blank and check the box forms from Lake County Department of Jobs and Family Services (Exhibit 5F […]).")).

### IV.   The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

> 3. The claimant has the following severe impairments: epilepsy, major depressive disorder, and anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

> 5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full

10

range of work at all exertional levels but with the following nonexertional limitations: occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; must avoid all exposure to hazards such as unprotected heights, moving machinery, and commercial driving; can understand, remember, and carry out simple instructions in a routine work setting with changes that are explained in advance; can respond appropriately to supervisors, coworkers, and work situations if the tasks performed are goal-oriented, but not at a production rate pace, and the work does not require more than superficial interaction, meaning that it does not require negotiating with, instructing, persuading, or directing the work of others.

6. The claimant is capable of performing past relevant work as a cleaner, housekeeper. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7. The claimant has not been under a disability, as defined in the Social Security Act, from June 15, 2010, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

## V. Law & Analysis

### A. Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535,

11

538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

### B. Standard for Disability

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.*

### C. Discussion

Lovejoy raises two issues on appeal. In her first issue, Lovejoy asserts that the ALJ erred in his assessment of Dr. Sunshine's opinions and by failing to address an opinion contained in a report to Lake County Department of Job & Family Services. In her second issue, Lovejoy

asserts that the ALJ's error in not including in the RFC limitations set forth by Dr. Sunshine was not harmless and remand is, thus, required. Because the Court finds that remand is required under the Lovejoy's first issue, it will not examine Lovejoy's second issue.

In her first issue before this Court, Lovejoy argues that the ALJ erred in his evaluation of the opinions of her neurologist, Dr. Sunshine. On January 17, 2014, Dr. Sunshine completed an "Abilities Self-Sufficiency" form requested by the Lake County Department of Job & Family Services. (ECF No. 9, PageID #: 742-743). Dr. Sunshine indicated that Lovejoy suffers from epilepsy, which is expected to continue indefinitely. (ECF No. 9, PageID #: 742 (describing Lovejoy's prognosis expected to continue as "unforeseen" and "lifetime")). Dr. Sunshine indicated Lovejoy could not drive and that her mental limitations included the inability to sustain an ordinary routine, perform activities within a schedule, and interact with the general public. (ECF No. 9, PageID #: 742). Dr. Sunshine checked the "no" box for releasing Lovejoy for fulltime employment, part time employment, training, and basic hands-on stationary work only. (ECF No. 9, PageID #: 742). On January 20, 2015, Dr. Sunshine indicated that Lovejoy suffers from epilepsy and that her condition was expected to continue for twelve months or more and that she was "unemployable". (ECF No. 9, PageID #: 740-741). On January 10, 2017, on another form completed at the request of Lake County Department of Job & Family Services, Dr. Sunshine checked the box indicating that he believed Lovejoy was "unable to engage in any substantial gainful activity" due to her impairment. (ECF No. 9, PageID #: 1468). Additionally, the ALJ attributed an opinion on an "Abilities Self-Sufficiency" signed "J. Bro C/O CFF" to Dr. Sunshine. (ECF No. 9, PageID #: 744-745). This form stated that Lovejoy was "100% disabled." (ECF No. 9, PageID #: 744). The form indicated that Lovejoy could carry out instructions and interact with the general public but due to her mental limitations, she could not perform activities

13

within a schedule or sustain an ordinary routine. (ECF No. 9, PageID #: 744). The form also

indicated that Lovejoy was not released for full-time or part-time work, training, or basic hands-

on stationary work. (ECF No. 9, PageID #: 745). Further, the form indicated that Lovejoy would

see a neurosurgeon, orthopedic surgeon, and a chronic pain management doctor.  (ECF No. 9,

PageID #: 745).[2]

The ALJ gave Dr. Sunshine's opinions little weight. (ECF No. 9, PageID #: 784). The

ALJ explained the basis behind his determination as follows:

> The record contains opinions from treating neurologist Joshua
> Sunshine, M.D., rendered on fill in the blank and check the box
> forms from Lake County Department of Jobs and Family Services
> (Exhibit 5F; 10F/38-42; 14F/30-32, 38-42). In said opinions, Dr.
> Sunshine opined the claimant is 100% disabled, as she is unable to
> engage in substantial gainful activity due to medical impairment
> (Id.). Dr. Sunshine specifically noted the claimant cannot sustain
> an ordinary routine or perform activities within a schedule, and he
> indicated the claimant is not released for full or part time
> employment, training, or even basic hands on stationary work only
> (Id.). In support of his opinions, Dr. Sunshine noted a diagnosis of
> epilepsy and total restriction from driving (Id.). According to the
> rules at issue in this case, a treating source's medical opinion on
> the issue of the nature and severity of an impairment is entitled to
> special significance and, when supported by objective medical
> evidence of record, is entitled to controlling weight (20 CFR
> 404.1527(c)(2) and 416.927(c)(2)). On the other hand, statements
> that the claimant is "disabled", "unable to work," cannot perform a
> past job, determines the residual functional capacity, or meets a
> listing, are not medical opinions, but are administrative findings
> requiring familiarity with the Regulations and legal standards set
> forth within the case (20 CFR 404.1527(d) and 416.927(d)). Such
> issues are reserved to the Commissioner, who cannot abdicate

---

[2] Lovejoy incorrectly contends that the "ALJ erred in not addressing the opinion from
LCDJFS [Lake County Department of Jobs & Family Services]" (ECF No. 11 at 14-15, 21). The
ALJ attributed this opinion to Lovejoy's treating physician, Dr. Sunshine. (ECF No. 9, PageID #:
783). Because any error in the ALJ including the opinion signed "J. Bro C/O CCF" as an opinion
of Dr. Sunshine favors Lovejoy as the assumption required the ALJ to treat it as a treating
source, the Court also includes this opinion as one of Dr. Sunshine's. However, the Court does
not determine whether the ALJ was accurate in doing so.

statutory responsibility to determine the ultimate issue of disability. Indeed, opinions on issues reserved to the Commissioner, such as Dr. Sunshine's determination that the claimant is disabled, and therefore unable to work, can never be given controlling weight, but must be carefully considered to determine the extent to which they are supported by the record as a whole or contradicted by persuasive evidence (Id.). In this case, Dr. Sunshine's opinions do not warrant great weight, as they are inconsistent with his own treatment notes, which contain consistently normal neurological findings on examination, including full strength, normal sensation, reflexes, and coordination, negative Romberg testing, and a gait within normal limits (Exhibit 2F, 6F, 10F, 14F, 16F, 21F). In addition, while Dr. Sunshine's treatment notes contain reports of persistent seizure activity, they also indicate some improvement with medication compliance, and are absent indications of recent medication dosage increases, thereby failing to support the claimant's alleged seizure frequency (Id.). Furthermore, the opinions are inconsistent with the remaining evidence of record, including the evidence of emergency treatment/hospitalization for seizure activity only during periods of medication compliance (Exhibit 1F).

(ECF No. 9, PageID #: 783-784).

Under the treating source rule,[3] an ALJ "must" give a treating source opinion controlling weight if the treating source opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Blakley* v. *Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2) (eff. to July 31, 2006))). "It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent the with

---

[3] The regulations for handling treating source evidence have been revised for claims filed after March 27, 2017.  *See* 20 C.F.R. § 416.927. Lovejoy filed her claim before the revision took effect.

other substantial evidence in the case record." SSR 96–2p, 1996 WL 374188, at *2 (July 2, 1996).

"If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley*, 581 F.3d at 406 (citing *Wilson*, 378 F.3d at 544); *see also* 20 C.F.R. § 404.1527(c)(2) (eff. Aug. 24, 2012). "In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned." *Cole v. Astrue*, 661 F.3d 931, 938 (2011); § 404.1527(c)(2). "These reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting SSR No. 96–2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). "This procedural requirement 'ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). The ultimate question is whether the Commissioner's decision is supported by substantial evidence and whether it was made pursuant to proper legal standards. *Cole*, 661 F.3d at 939.

Lovejoy argues that the ALJ failed to give good reasons for giving Dr. Sunshine's opinion "less than great or controlling weight." (ECF No. 11 at 15). Thus, before the Court are two questions: 1) whether the ALJ failed to give good reasons for not giving Dr. Sunshine's

opinions controlling weight (*Gayheart*, 710 F.3d at 377); and 2) whether the ALJ failed to give good reasons for giving Dr. Sunshine's opinions less than great weight (*Gayheart*, 710 F.3d at 376). As explained below, the Court finds that remand is required because the ALJ failed to explain his decision to give Dr. Sunshine's opinions less than controlling weight.

As an initial matter, the ALJ did not error in giving little weight to Dr. Sunshine's opinions that Lovejoy was unemployable, 100% disabled, and unable to engage in substantial gainful activity. An ALJ is not required to give any deference to opinions on issues reserved to the Commissioner.  20 C.F.R. §§ 404.1527(d), 416.927(d).  These issues include: (1) whether a claimant has an impairment or combination of impairments that meets or medically equal an impairment in the Listing of Impairments; (2) the claimant's RFC; (3) the application of vocational factors; and (4) whether a claimant is "disabled" or "unable to work."  20 C.F.R. §§ 404.1527(d)(l)-(2), 416.927(d)(l)-(2).

The ALJ failed, however, to follow Social Security regulations in evaluating Dr. Sunshine's opinions regarding Lovejoy's abilities to carry out instructions, interact with the general public, sustain an ordinary routine, or perform activities within a schedule. Here, the ALJ does not give good reasons for declining to give controlling weight to these opinions. *Gayheart*, 710 F.3d at 377 ("The failure to provide 'good reasons' for not giving [a treating source's] opinions controlling weight hinders a meaningful review of whether the ALJ properly applied the treating-physician rule that is at the heart of this regulation.") (citing *Wilson*, 378 F.3d at 544). The ALJ states that controlling weight should not be given to Dr. Sunshine's opinions because "opinions on issues reserved to the Commissioner, such as Dr. Sunshine's determination that the claimant is disabled, and therefore unable to work, can never be given controlling weight, but must be carefully considered to determine the extent to which they are supported by

the record as a whole or contradicted by persuasive evidence[.]" (ECF No. 9, PageID #: 783). This explanation does not address Dr. Sunshine's opinions regarding Lovejoy's mental limitations. The ALJ explained further that Dr. Sunshine's opinions should not be given great or controlling weight because his records were "inconsistent with his own treatment notes, which contain consistently normal neurological findings on examination, including full strength, normal sensation, reflexes, and coordination, negative Romberg testing, and a gait within normal limits", that his notes indicate "some improvement [in seizure activity] with medication compliance, and are absent indications of recent medication dosage increases, thereby failing to support the claimant's alleged seizure frequency", and that his opinions "are inconsistent with the remaining evidence of record, including the evidence of emergency treatment/hospitalization for seizure activity only during periods of medication compliance[.]" (ECF No. 9 at 784).

Although the ALJ's decision used phrases key to the controlling weight analysis such as inconsistency and supportability, the ALJ does not actually identify substantial evidence that is purportedly inconsistent with the opinions at issue. *Gayheart*, 710 F.3d at 377. Specifically, one cannot determine how the examples of inconsistencies cited by the ALJ – "full strength, normal sensation, reflexes, and coordination, negative Romberg testing, and a gait within normal limits" and Lovejoy's improvement in seizure frequency with medication compliance – are related to Dr. Sunshine's opinions regarding Lovejoy's abilities to carry out instructions, interact with the general public, sustain an ordinary routine, or perform activities within a schedule. Although the ALJ's decision includes examples of how Dr. Sunshine's records may indicate minimal physical limitations, the ALJ's decision fails to address the mental limitations – which are the *actual* functional limitations addressed by Dr. Sunshine's opinions. "The ALJ 'may not summarily discount a treating-source opinion as not well-supported by objective findings or being

18

inconsistent with the record without identifying and explaining how the substantial evidence is purportedly inconsistent with the treating-source opinion.'" *Smalley v. Comm'r of Soc. Sec.*, No. 20-1865, 2021 WL 4026783, at *3 (6th Cir. Sept. 3, 2021) (quoting *Hargett*, 964 F.3d at 552); *see also Friend*, 375 F. App'x 552. The ALJ failed to identify or explain how the substantial evidence is inconsistent with Dr. Sunshine's opinions.

Additionally, in the previous remand order, Magistrate Judge Thomas Parker noted that "the ALJ's additional statements that Dr. Sunshine's and the LCDJFS opinions were due little weight because they were inconsistent with the record evidence does not render harmless the ALJ's failure to follow Social Security regulations in evaluating Dr. Sunshine's and the LCDJFS opinions, *because nothing in the ALJ's analysis is sufficiently specific to make clear to a subsequent reviewer the weight given to their opinions regarding Lovejoy's functional limitations.*" *Lovejoy*, No. 1:18-CV-514, 2019 WL 366687, at *9 (emphasis added) (citing *Gayheart*, 710 f.3d at 376; *Cole*, 661 F.3d at 938; *Bowen*, 478 F.3d at 746; (Tr. 43–44)). Magistrate Judge Parker further warned of the inadequacy of the ALJ's explanation: "[t]he ALJ's citation of a tiny handful of records to support his 'inconsistency' opinion was inadequate. And the ALJ's RFC finding does not appear to account for how much time Lovejoy might miss from work due to epileptic seizures on a monthly basis or whether, given such limitations, Lovejoy could sustain gainful activity in an employment setting." *Lovejoy*, 2019 WL 366687, at *9, n.1. The Court notes that the ALJ's explanation does not fix the previously identified issues that required remand.

Notably, the Commissioner does not address Lovejoy's argument that the ALJ erred by not giving Dr. Sunshine's opinion controlling weight. Instead, the Commissioner argues that the ALJ "thoroughly explained why he gave little weight to Dr. Sunshine's opinions, including on

forms from the Lake County Department of Jobs and Family Services[.]" (ECF No. 15 at 8). Indeed, the ALJ addressed many opinion-weighing factors under 20 C.F.R. § 404.1527(c) including the frequency and nature of Dr. Sunshine's treating relationship with Lovejoy, the formatting of the opinions consisting of "fill in the blank and check the box forms", and certain inconsistencies (noted above) with Dr. Sunshine's treatment notes and other medical records. However, "these factors are properly applied only after the ALJ has determined that a treating-source opinion will not be given controlling weight." *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)). Here, the ALJ failed to give good reasons for declining to give controlling weight to Dr. Sunshine's opinions regarding Lovejoy's mental functional abilities; thus, the decision's explanation fails *before* moving onto the opinion-weighing factors under 20 C.F.R. § 404.1527(c).

Accordingly, the Court finds that the ALJ erred by failing to follow the regulations and adequately explain why controlling weight was not given to the opinions of Lovejoy's treating neurologist.

Where an ALJ fails to give good reasons for declining to give a treating physician's opinion controlling weight, "[w]e will reverse and remand a denial of benefits, even though 'substantial evidence otherwise supports the decision of the Commissioner.' " *Friend*, 375 Fed. Appx. at 551 (quoting *Wilson*, 378 F.3d at 543–46). "[A]n ALJ cannot simply invoke the criteria set forth in the regulations if doing so would not be 'sufficiently specific' to meet the goals of the 'good reason' rule." *Id*. However, an ALJ's failure may be harmless error if "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it[.]" *Id*. (internal quotation marks omitted) (quoting *Wilson*, 378 F.3d at 547).

The Commissioner also argues that Dr. Sunshine's opinions were "patently deficient" as

they were check-box opinions, unaccompanied by explanation.[4] (ECF No. 15 at 8-9). The Sixth Circuit has found physician opinions "patently deficient" when they involve "check-box analysis ... not accompanied by any explanation." *Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 474 (6th Cir. 2016). In *Hernandez*, the court found it "nearly impossible" to decide whether the objective medical evidence supported a physician's opinion because the physician did not explain whether those limitations existed when the claimant was on medication or off of it. *Id.* "Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best." *Id.* (quoting *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993)).

The opinion at issue in this case is distinguishable from that in *Hernandez*. In this case, Dr. Sunshine's opinions were not so deficient "that that the Commissioner could not possibly credit [them,]" as is required for a finding of harmless error. *Hernandez*, 644 F. App'x at 474 (cleaned up). By contrast, the form in *Hernandez* lacked "any explanation." *Id.*

Here, Dr. Sunshine explained that his opined limitations to Lovejoy's mental functional abilities were caused by her epilepsy, (*see, e.g.*, ECF No. 9, PageID #: 739), that it was a lifelong illness requiring continuous medications and regular medical appointments (*see, e.g.*, ECF No. 9, PageID #: 742-743), and that she suffered from chronic pain that was not responsive to NSAID medications (*see, e.g.*, ECF No. 9, PageID #: 744-745). Furthermore, Dr. Sunshine's opinions are supported by over five years of medical records he generated close in time to his completion of

---

[4] The other two exceptions where harmless error may occur are "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion;" or "where the Commissioner has met the goal of § 1527(d)(2)—the provision of the procedural safeguard of reasons—even though she has not complied with the terms of the regulation." *Friend*, 375 Fed. Appx. at 551 (internal quotation marks omitted) (quoting *Wilson*, 378 F.3d at 547)." (quoting Wilson, 378 F.3d at 543–46). These exceptions are not at issue here as the Commissioner does not argue that the error was harmless because the ALJ adopted Dr. Sunshine's mental functional limitations nor that the Commissioner otherwise met the goal of § 1527(d)(2) despite failing to follow the regulation.

the opinion forms. (*See, e.g.*, ECF No. 9, PageID #: PageID #: 748-749 (August 1, 2016: Dr. Sunshine noted Lovejoy was having breakthrough seizures, blurred vision, excessive urination, seizures and memory/thinking problems.)).

Dr. Sunshine's opinions were "sufficiently supported" such that the ALJ could have rationally credited them. *See Johnson v. Comm'r of Soc. Sec.*, No. 1:20CV156, 2021 WL 1214795, at *4 (N.D. Ohio Mar. 31, 2021) (check-box opinion may be sufficiently supported where the form is supported by medical records generated close in time to the completion of the form). Accordingly, the ALJ's failure to address or explain giving less than controlling weight to Dr. Sunshine's opinions regarding Lovejoy's mental functional limitations was not harmless error.

Having determined that the ALJ committed reversible legal error in analyzing Dr. Sunshine's treating source opinions, remand is required, and the Court need not address Lovejoy's remaining issue.


## VI. Conclusion

Based on the foregoing, it the Court REVERSES the Commissioner of Social Security's nondisability finding and REMANDS this case to the Commissioner and the ALJ under Sentence Four of § 405(g).


Dated: August 10, 2022

s/ *Carmen E. Henderson*
CARMEN E. HENDERSON
U.S. MAGISTRATE JUDGE